**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Marlyce Kemnitz, Plaintiff, vs. MICHAEL J. ASTRUE, Commissioner of Social Security, Defendant. | ) | **REPORT AND RECOMMENDATION** Case No. 1:07-cv-102 |

Plaintiff, Marlyce K. Kemnitz ("Kemnitz"), seeks judicial review of the Social Security Commissioner's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§401-433. Chief Judge Daniel L. Hovland has referred this matter to the undersigned for preliminary consideration.

## I. BACKGROUND

### A. Procedural History

Kemnitz protectively filed an application for disability insurance benefits on November 5, 2003, alleging an onset date of December 15, 1998. (Tr. 51-53). Her application was denied initially and upon reconsideration. (Tr. 32, 38). An administrative hearing was held at her request, after which the Administrative Law Judge (ALJ), in a decision dated on August 16, 2005, concluded that she was not entitled to benefits. (Tr. 12, 228). When the Appeals Council denied her request for review of the ALJ's decision, she filed suit in this court.

On October 20, 2006, the undersigned issued a report recommending that this matter be remanded for further development of the record. (Tr. 342-377). Of particular concern to the

undersigned was the apparent dearth of evidence to support the residual functional capacity ("RFC") determination on which the ALJ's decision was largely based. (Tr. 342-377). The court adopted the undersigned's report and recommendation and remanded this matter to the Commissioner for further development of the record. (Tr. 378). In so doing it specifically instructed that Kemnitz's RFC be reassessed and that the resulting determination be based on substantial medical evidence. (Tr. 378). The Appeals Council responded by vacating the Commissioner's final decision and remanding Kemnitz's application to an ALJ for further proceedings. (Tr. 378-380).

On May 15, 2007, ALJ Robert Maxwell convened a supplemental hearing at which three people testified: Kemnitz, her husband William, and a vocation expert. (Tr. 284, 387). On June 11, 2008, he issued his decision--that Kemnitz was not disabled through June 30, 2004. (Tr. 268-280). The Appeals Council denied Kemnitz's subsequent request for review and adopted ALJ Maxwell's findings as the Commissioner's final decision.

Kemnitz again sought this court's review of the Commissioner's decision. She and the Commissioner have filed cross-motions for summary judgment. This matter is therefore ripe for the court's consideration.

**B. Factual Evidence and Medical Records**

A detailed summary of the factual evidence of record along with Kemnitz's medical history up to the time of the first ALJ hearing can be found in the undersigned's Report and Recommendation in Case No. 1:05-cv-125. (Tr. 342-377). What follows is a brief summary of the additional medical evidence that was obtained.

Plaintiff returned to Dr. Benitez on June 16, 2005, for a follow-up on her primary diagnosis of MS. (Tr. 409-410). She complained mostly of some muscle stiffness and spasm that had gone

away with the taking of Bacelofen. She reported being mostly asymptomatic. Dr. Benitez reported there were no other neurological symptoms. He continued Kemnitz on her present drug regime and suggested she return in November. (Tr. 409).

In July 2005, Kemnitz saw Ralph T. Dunnigan, M.D., and reported "a bit of fatigue associated with heat," no headaches, and no recurrence of leg symptoms. (Tr. 420). Other than slightly favoring her right leg when walking, Plaintiff's neurological examination was unremarkable (Tr. 421). Dr. Dunnigan noted that her MS was clinically stable, although she had a "minor exacerbation" in December, and that she was "doing well" overall (Tr. 421).

In September 2005 Plaintiff underwent gastric bypass surgery. (Tr. 416-419). Two months later, Dr. Dunnigan noted that she had "some weakness of her legs," but that she "functioned well" for the most part. (Tr. 422). He noted that she had lost a considerable amount of weight, and that she had fair energy, improved vision, no significant dysfunction in her arms, no notable spasticity in her legs, intact sensation to pinprick, and clear thought processes. (Tr. 422). He encouraged Plaintiff to be active (Tr. 423).

Plaintiff continued to receive chiropractic care through at least April 2007, for largely the same complaints and symptoms of soreness and back and right leg pain, with an occasional report of a headache. (Tr. 424-442).

### C. Administrative Hearing Testimony

Kemnitz testified that she is capable of driving short distances, has balance issues necessitating the use of a cane when walking over uneven ground, and has obtained a handicap sticker for her vehicle from Ralph Dunnigan, the neurologist with whom she is presently doctoring. (Tr. 288-89, 308-09, 319-20, 323-24). As for her present physical condition, she testified that she

continues to experience fatigue, memory problems, numbness, tingling in her legs, back pain, and headaches consequent to her MS. (Tr. 289-293). Additionally, she testified that she suffers from depression, temporary vision losses attributable to recurring optic neuritis, and planter fasciitis. (Tr. 289-293). When asked by counsel how her routine has been impacted, she testified that, because of her deteriorating health and dexterity, she no longer gardens or crochets, cannot assist her husband with his lawn service business, requires varying degrees of assistance when performing routine household chores,[1] needs to nap often, has trouble with buttons, and no longer wears shoes with laces. (Tr. 289-299, 305-306, 311-313). She further testified that she continues to receive chiropractic treatment for her back, submits to yearly MRIs as a means of monitoring the progression of her MS, continues to take anti-depressants along with vitamin supplements, and injects herself subcutaneously with daily doses of Copaxine, after which she experiences an immediate post injection reaction that leaves her feeling flushed and momentarily out of breath. (Tr. 296-303). She remains capable of attending to her personal needs and grooming, however. (Tr. 296-303).

Before allowing William to testify, ALJ Maxwell sought comment from Kemnitz about the lack of any references to fatigue complaints in her treating physicians' notes, her denial of any memory problems to Dr. Dunnigan during a July 2006 visit, and her decision to wait until 2003 to apply for disability insurance benefits. (Tr. 314-18, 324). He also inquired about Kemnitz's job earnings out of concern that, if they were too low, her past relevant work would not qualify as substantial gainful activity for purposes of the Social Security Act. (Tr. 314-318). Kemnitz did not provide much additional information about her earnings. (Tr. 318). As for ALJ Maxwell's other

[1] According to Kemnitz, she shares kitchen duties with her husband. She washes clothes approximately two time per week but relies on her husband to carry it up and down the stairs. (Tr. 313).

inquiries, she could neither account for her physicians' failure to chronicle in detail her fatigue complaints nor provide additional insight as to why she filed her application for disability insurance benefits five years after her alleged onset date (Tr. 316-18). Ironically, she could not recall making any statements about her memory to Dr. Dunnigan. (Tr. 324). She did, however, reiterate that she had been experiencing memory problems to which William, her husband, could attest. (Tr. 324).

William did just that, testifying that Kemnitz's memory was "on the down slide." (Tr. 328-335). As an example, he cited his need to occasionally remind Kemnitz to take her medications. (Tr. 328-335). With respect to routine activities such as household cleaning, washing dishes, and shopping, he testified Kemnitz had declined physically and needed assistance with most everything. (Tr. 329-332). He added that, as a couple, he and Kemnitz were no longer active socially and less apt to travel on account of Kemnitz's condition. (Tr. 329-331).

At the close of William's testimony, the ALJ posed a series of hypotheticals to the vocation expert, William V. Tucker. (Tr. 335). First, he asked Tucker whether a high school educated individual under the age of fifty with Kemnitz's work history and medically determinable impairments could work on a competitive basis. (Tr. 337). Tucker responded that the need for daily naps was inconsistent with any kind of full-time employment. (Tr. 338). Next, the ALJ inquired whether a person would be capable of working if she could occasionally lift or carry fifty pounds, could stand, walk, or sit with normal breaks for six hours of an eight-hour workday, had no limitations with respect to her ability to push or pull, and suffered from no observable manipulative, communicative, or environmental limitations. (Tr. 338-339). Tucker testified that such a person should be capable of performing both medium and light, sedentary work regardless of her past employment. (Tr. 339). Finally, for his third hypothetical, the ALJ directed Tucker to

consider the employment prospects of a person who could occasionally lift less than ten pounds, had no weight that could be lifted frequently, and could stand or walk no more than two hours in an eight hour day. (Tr. 339-40). Tucker responded that such a person simply could not be expected to perform any kind of full-time work on a competitive basis. (Tr. 340).

**D. ALJ's Decision**

ALJ Maxwell issued his written opinion denying Kemnitz's application for disability insurance benefits on June 11, 2007. (Tr. 268-280). At the outset of his analysis he noted that Kemnitz last met the insured status requirements of the Social Security Act on June 30, 2004. (Tr. 270). He then proceeded to review the application, employing the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520.

At the first step, ALJ Maxwell concluded that Kemnitz had not engaged in substantial gainful activity during the period of her alleged onset date through the date she was last insured. (Tr. 270). In fact, after reviewing Kemnitz's work history, he went so far as to say that she had never engaged in substantial gainful activity given her paltry earnings. (Tr. 270).[2]

At the second and third steps, ALJ Maxwell noted that Kemnitz was suffering from the following severe impairments through her last insured date: possible low back pain with no evidence of radiculopathy and mild to moderate degenerative changes at L4-L5 and L5-S1. (Tr. 270). He acknowledged that Kemnitz had explored the possibility of back surgery in the year prior to being diagnosed with MS and had presented to chiropractors between 1999 and 2004 with complaints of lower back and neck pain, numbness, and weakness in her lower extremities. (Tr. 271). However, he also stressed that Kemnitz only once sought treatment from a licensed physician prior to 2003

[2]ALJ Maxwell was not persuaded that Kemnitz could meet the threshold income requirements (a monthly income of $500) so as to qualify any of her work as substantial gainful activity. (Tr. 270, 316-319).

and only thrice visited Dr. Ragland, whose conservative treatment recommendations consisted of physical therapy and exercise. (Tr. 271).

ALJ Maxwell largely discounted statements made by Dr. Ragland about Kemnitz's pain and functional limitations on the grounds that they did not reflect his independent opinions and were inconsistent with the objective medical evidence. (Tr. 271-73). He observed that, other than a tandem gait impairment, the results of a neurological and musculoskeletal examination performed by Dr. Ragland on February 16, 2005, were essentially normal. (Tr. 272). Additionally, he stressed that Dr. Benetiz had examined Kemnitz around the same time as Dr. Ragland and reported that Kemnitz appeared functional. (Tr. 272).

ALJ Maxwell conceded there was sufficient evidence to support a diagnosis of early stage MS as of June 30, 2004. However, he was quick to add that such a diagnosis by itself did not import a degree of functional limitation necessary for determining Kemnitz's RFC. (Tr. 274). In addition, he noted that several of Kemnitz's reported symptoms--weakness, numbness, and tingling in her lower extremities--were by her own admission intermittent and mild, that her complaints to treating physicians were not always consistent, and that she had been asymptomatic for weeks at a time. (Tr. 274-75).

ALJ Maxwell did not find Kemnitz to be a particularly credible witness, opining that her testimony at the supplemental hearing was "highly exaggerated." (Tr. 275). He found it significant that Kemnitz first complained to Drs. Benitez and Ragland about her fatigue in February 2005. (Tr. 273-75). He also took note of medical records that, contrary to testimony presented at the supplemental hearing, indicated Kemnitz had been doing fine and was essentially asymptomatic since being prescribed Copaxone in November 2004 and Baclofen and February 2005. Finally, he

reflected upon the encouraging results of an MRI Kemnitz had undergone in July 2006,[3] Kemnitz's positive report to Dr. Dunnigan, and the results of a mental status examination conducted by Dr. Benitez in November 2004. (Tr. 278).

In sum, after comparing Kemnitz's impairment to the presumptively disabling impairments listed at 20 C.F.R. § 404, Subpart P, Appendix 1, ALJ Maxwell concluded that Kemnitz did not have an impairment or combination of impairments that rose to listing level severity. (Tr. 277-79). He reasoned that Kemnitz's treating physicians had not reported the necessary clinical, laboratory, or radiographic finding specified in the applicable regulations. (Tr. 277-79). Additionally, he opined that Kemnitz had not satisfied the listings for musculoskeletal complaints and MS, explaining that she did not exhibit disorganization of motor function, had not exhibited any visual or mental impairments that restricted her performance of functional activities for at least twelve continuous months, and that her MS was deemed clinically stable by Dr. Dunnigan on November 30, 2005. (Tr. 277-78).

Moving on to the fourth step of his analysis, ALJ Maxwell addressed Kemnitz's residual functional capacity, that is her "ability to do sustained work-related physical and mental activities in a work setting on a regular basis." (Tr. 279). Based upon his review of the evidence, he was of the opinion that Kemnitz retained the functional capacity to perform a full and wide range of work activity at the medium exertional level and below. (Tr. 279). And because he did not believe that Kemnitz had any past relevant work, he proceeded to the fifth step of his analysis. (Tr. 279). There he concluded that there were significant jobs existing in the national economy that Kemnitz was

[3]Kemnitz apparently underwent a third MRI in the summer of 2006, the results of which indicated that the lesion in the left frontal area of her brain was much smaller and that no new lesions had developed since her previous MRI. (Tr. 278). ALJ Maxwell opined that these results directly contradicted statements made at the supplemental hearing by Kemnitz about her MRI results, casting significant doubts on her credibility. (Tr. 278).

capable of performing. (Tr. 279).

## II. LEGAL DISCUSSION

### A. Standard of review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review. Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id. Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion. Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993). The Eighth Circuit has stated, "Our

touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.

**B. Law governing eligibility for adult benefits**

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act"). 42 U.S.C. § 423(a)(1)(D). To meet this burden, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment. 42 U.S.C. § 423(d)(1)(A)." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the claimant would be hired if he or she applied for work. 42 U.S.C. § 423(d)(2)(A). Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id.

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1) whether the claimant is presently engaged in a substantial gainful activity,

(2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4) whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. § 404.1545. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[4] E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005). Claimant's

[4] In Polaski, the Eighth Circuit approved a settlement agreement with the Secretary of HHS that contained, in part, the following language, which the court stated was a correct statement of the law with respect to the manner in which subjective pain complaints are to be analyzed:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of

subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that are supported by accepted diagnostic techniques and that are not inconsistent with other substantial evidence. This rule does not apply, however, to opinions regarding disability or inability to work because these determinations are within the exclusive province of the Commissioner. The Eighth Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. See Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir.2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. See Stormo [v. Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).
>
> . . . .
>
> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is

---

> subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication; and
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. [Emphasis in original.].

739 F.2d at 1322. The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

> due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

Ellis v. Barnhart, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner. The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law. 20 C.F.R. § 404.1504. E.g., Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996). And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Pearsall v. Massanari, 274 F.3d at 1217.

## III. ANALYSIS AND DISCUSSION

When this case was before the court earlier, the question of whether there was substantial evidence supporting the Commissioner's denial of benefits was a particularly close one. The primary concern of the court was whether the then very recent diagnosis of MS had been adequately considered. While the diagnosis of MS came after the plaintiff's last date of eligibility for benefits, the court was concerned that the MS had likely existed for some time prior to the last date of eligibility and had not been adequately addressed. In addition, the court had several additional concerns about the development of the record and the evaluation of the evidence that was detailed more fully in the court's earlier decision.

Following remand, additional medical records were obtained and a new hearing was held before a different ALJ. After considering all of the record evidence, both old and new, the second ALJ concluded that Kemnitz was not disabled from the alleged onset date through her last date of eligibility for benefits of June 30, 2004, and was capable of qualifying for work existing in

significant numbers in the national economy.

While the undersigned would not reach all of the same conclusions as the second ALJ, it does appear there is substantial evidence supporting the conclusion that Kemnitz had the residual functional capacity of performing at least sedentary work through her last date of eligibility for benefits. The supportive evidence includes the following:

- Dr. Benitez reported that his examination of Kemnitz on February 15, 2005, revealed she was "quite functional." In this court's earlier consideration of the case, the undersigned was concerned that this solitary statement could have several different meanings depending upon the context and questioned whether it was sufficient to support the conclusions drawn by the first ALJ, particularly in light of Dr. Ragland's conclusions that Kemnitz was not capable of functioning at a level that would permit her to work. While clarification was not sought from Dr. Benitez regarding this specific comment upon remand, additional medical records were obtained from Dr. Benitez and Dr Dunnigan that circumstantially support the conclusion that what Dr. Benitez meant by his February 15, 2005, comment was that Kemnitz's MS imposed no significant functional limitations overall.
- The records of examinations conducted by Dr. Benitez and Dr. Dunnigan later in 2005 and in 2006 obtained upon remand revealed that Kemnitz was doing well and suffering no significant limitations as a result of her MS. In fact, Dr. Dunnigan recommended that she remain active. While these examinations were after the time period under consideration, they are relevant longitudinal evidence in terms of assessing the severity of Kemnitz's MS prior to the last date of her eligibility for

benefits. And, the records of these examinations are supportive of the ALJ's conclusion that, as of June 30, 2004, Kemnitz's MS was early stage and not debilitating enough to prevent her from being able to work.

In terms of the contrary medical evidence, the second ALJ gave detailed explanations for why he discounted the opinions of Dr. Ragland that Kemnitz essentially was not able to work. Among other things, the ALJ noted that Dr. Ragland's opinions regarding Kemnitz's functional capacity were not based on any testing, for the most part relied upon Kemnitz's own reports of her limitations, and were contrary to other medical evidence, including some of his own reports. Further, after a detailed review, it appears the second ALJ considered all of the relevant medical evidence, including the chiropractic evidence, and that his assignment of the weight accorded the particular items of medical evidence was within his province.

With respect to the evidence from Kemnitz and her husband, the ALJ concluded that their reports of Kemnitz's limitations were exaggerated. Among other things, the ALJ contrasted their reports with what Kemnitz herself reported to her doctors on a number of occasions and what her doctors, other than Dr. Ragland, concluded about her condition. While the undersigned might not personally agree with all of the reasons given by the ALJ for discounting the credibility of Kemnitz and her husband, this court must generally defer to the credibility determinations of the ALJ, and there is some support in the record for the reasons expressed by the ALJ for discounting their credibility.

Kemnitz has raised other issues. However, the foregoing is dispostive.

## IV. CONCLUSION AND RECOMMENDATION

The undersigned recommends that the Commissioner's Motion for Summary Judgment (Doc.

No. 8) be **GRANTED** and Kemnitz's Motion for Summary Judgment (Doc. No. 10) be **DENIED** and that the complaint be **DISMISSED WITH PREJUDICE**.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

Pursuant to D.N.D. Civil L.R. 72.1(D)(3), any party may object to this recommendation within ten (10) days after being served with a copy of this Report and Recommendation. Failure to file appropriate objections may result in the recommended action being taken without further notice or opportunity to respond.

Dated this 3rd of June, 2009.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr.
United States Magistrate Judge